# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-24-00384-CR

---

**Francisco Lopez, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 299TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-DC-20-100024, THE HONORABLE MICHAEL KEASLER, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Francisco Lopez appeals his conviction as a party to murder. *See* Tex. Penal Code § 19.02. The jury implicitly rejected Lopez's affirmative defense of duress and assessed punishment at twenty-eight years' imprisonment. *See id.* § 12.32. The trial court sentenced Lopez accordingly. Lopez challenges the sufficiency of the evidence supporting the jury's murder verdict and rejection of his defense of duress. He also challenges the admission of extraneous-offense evidence showing his role in a gas-station shooting that occurred eight days before the murder, and evidence of Facebook and TextNow messages that he exchanged with his non-testifying co-defendant. We will affirm the trial court's judgment of conviction.

Lopez was dissatisfied with the pay at his call-center job, so when his friend Frank Sosa was arrested for dealing drugs and Sosa's supplier sought a substitute, Lopez accepted. Lopez testified that despite the danger, he saw dealing drugs as an opportunity to better his financial situation. He had heard about cartel violence since middle school, and while he had not seen any such violence firsthand, he understood that cartels could kill someone for stealing money "[o]r just being short" on their money.

Lopez became a middleman for methamphetamine trafficking. His supplier in Mexico sent the drugs with a courier, whom Lopez met every couple of weeks. The supplier expected payment after Lopez sold the drugs to others. When two of Lopez's customers claimed they were robbed and unable to pay, Lopez was unsure whether they were being truthful, but regardless, their nonpayment made him short about $35,000 or $40,000 to his supplier. Rumor spread that Jason Hicks, known as "H-Town," and Ed Tijerina had robbed Lopez's customers. Lopez testified at trial that the supplier told him "to make it right," and that if Lopez "didn't give him his money, he was going to start killing [Lopez's] family." Lopez also testified that the supplier said "he wanted H-Town to get killed," "it needed to be done," and "it was either H-Town or [Lopez]," but there was no documentary evidence of those threats. This testimony contradicted Lopez's pretrial statements to police denying that he received threats.

Lopez told the jury that the supplier instructed him to contact "E"—Evan Zanders, Lopez's neighbor and later his co-defendant—because E "had roughed up some people with [Sosa]

---

[1] The facts are taken from Lopez's testimony at trial, his videotaped interviews with police that were admitted into evidence, and other witnesses' testimony at trial as noted.

before." After Lopez made that contact, he and E "had to get it ready" and locate H-Town.[2]  Lopez learned that H-Town was at an acquaintance's house, and on June 15, Lopez drove there with E. When H-Town got into his car, Lopez and E followed him to a Shell gas station, where they planned to kill him.  When they arrived, E got out of the car, and Lopez drove onto the feeder road, followed a curve around the gas station, and re-entered to pick up E, thinking that the shooting was done.  E's shots missed.

Lopez said that the supplier did not hear any media report of the gas-station shooting and requested proof that it occurred.  Lopez testified that about two days after the gas-station shooting, he was frightened when the supplier started sending him pictures of Lopez's family members.  Lopez recalled the supplier saying that H-Town, Tijerina, and Guillermo Bernal Gomez had been working together; that Gomez had set up Lopez's customers to be robbed; and that Lopez needed to "handle that" so the supplier "wouldn't have to do anything to" Lopez and his family.  None of the messages that Lopez exchanged with the supplier were offered as evidence at trial.  Lopez noted that he had used about a dozen different phones during the relevant timeframe; that he deleted all the phone messages daily; and that every twenty or thirty days he deleted everything on the phone, threw it away, and got a new one.

On June 23, eight days after the gas-station shooting, the Gomez shooting occurred. Lopez testified that he was a participant in conversations leading up to it concerning exactly how and where it would be done.  According to Lopez, on the morning of the shooting, he received a picture of his sister from the supplier.  Lopez testified that the supplier called to say that Gomez

---

[2]  Around this time, Lopez sent a June 14 Facebook message to a friend stating, "I've had the most exciting time of life in the last two days."

3

was looking for "ice,"[3] and that "today is the day that you need to go ahead and handle that." Lopez denied such threats when a police detective asked Lopez directly whether somebody had threatened him. Lopez said the only one who threatened him was E, when E did not get his money after Gomez's shooting.

Lopez's pretrial denial of being threatened was consistent with the trial testimony from his friend, Misty Lurz, who was also selling drugs with Lopez. She testified that Lopez "never said that they threatened him," only that they were "on his ass a lot about the money." Lurz recalled Lopez telling her that he was upset because Gomez had taken money from a lockbox in Lopez's car. When asked if the reason for the murder was that Gomez had robbed Lopez of $5,000 in a lockbox, Lurz answered, "That's where—that's where it actually stems from." Before the murder, Lurz tried to dissuade Lopez. She testified that she "wanted him to rethink the situation"; she had tears running down her face while telling him not to do this and that "[t]here's got to be another way." Lopez agreed that Lurz had tried to talk him out of doing this.

Instead, Lopez went to Academy and bought bullets for E's 9-millimeter gun. Lopez testified that "it was initially supposed to happen" at another apartment complex, but "[t]he plan changed," and he "had to wing it" after he picked up Gomez sometime between 9:00 and 11:00 that night and drove to the planned site, where people were driving around. Lopez and Gomez went to McDonald's, where E met them and got into the car. After picking up food and drinks in the drive-thru lane, Lopez drove all three of them to the apartments where he grew up. On arriving there, E, who was supposedly going to sell drugs to Gomez, got out of the car and gestured for Gomez to follow him to an apartment. Lopez watched E and Gomez walk into a

---

[3] Lopez later testified that "ice" is methamphetamine.

4

breezeway until they were out of sight. Lopez heard gunshots. E came running back to the car, and Lopez drove them away. Later, Lopez facilitated payment to E for killing Gomez. Gomez was found deceased next to the breezeway at the apartment building. A medical examiner testified that Gomez's cause of death was gunshot wounds and that the manner of his death was homicide.

Lopez had two interviews with police, including then-detective Sergeant Nathan Sexton. Videos of both interviews were admitted into evidence. In the first interview, Lopez claimed that Gomez was his friend and said that he learned about Gomez's killing "[w]hen y'all released it in the news. It was like a week later. . . . I remember being surprised as shit when I saw that on the news, then I had heard that they couldn't find him for a little bit." Lopez claimed that on the night of the murder, he had picked up Gomez, who had asked for a ride to buy meth from a "plug."[4] Lopez and Gomez met the plug at McDonald's, and then Lopez dropped off Gomez and the plug at the apartments.[5] Lopez added that when he dropped them off, he saw two black people sitting on the stairs. In response to detectives' specific questions, Lopez denied taking Sosa's place selling drugs when Sosa went to jail, having any contact with the cartel people who dealt with Gomez, seeing E on the night of the murder, setting up anything, knowing who shot Gomez, and knowing who was there and what occurred: "Once again, I don't know what the hell happened to [Gomez]." Lopez expressly denied being threatened:

> Detective Sexton: Has somebody—has somebody threatened you?
>
> Lopez: No, sir. I don't know anything. I dropped them off, I did what [Gomez] asked me to do, and that was it. Now, if I'm under arrest, go ahead and place me under arrest.

---

[4] The affidavit for Lopez's arrest warrant indicates that a "plug" is a drug dealer.

[5] Lopez later told police that he picked the building that "looked the darkest."

At trial, Lopez testified that he was dishonest in this interview, pointing out that he had been using methamphetamine heavily at the time, and that he was not sober when he went to the police station.

In his second interview with police, which occurred after his arrest, Lopez said that after H-Town and Tijerina robbed him, he received a call with instructions from "the dude that I was talking to in Mexico," telling him to get in touch with E, who would know what to do from there: "I was just told, hey, go—go make this happen, like, you need to take them to the spot and drop them off, and just go about your way." According to Lopez, this person also said "that needed to get handled because they had got us for all that work, like, they robbed us." When asked what the robbery by H-Town and Tijerina had to do with Gomez, Lopez said he was told that Gomez was working with H-Town and Tijerina. Lopez was also asked about the guns and any payment involved in both shootings. He said that after Gomez was shot, E kept the gun. For the gas-station shooting, Lopez had taken his own gun with him, a chrome ".40," and E had "a []9." He denied that E was paid for the gas-station shooting; "he was just ridin' because I had told him I had some problems," and E helped. When Lopez's payment to E for Gomez's shooting was delayed, E sent threats to Lopez. Messages that E and Lopez exchanged on Facebook and TextNow were admitted into evidence.

Lopez testified that he was not completely honest in his second interview, either. He left out "[t]he tie into the gas station, I was still kind of trying to push that to the side." And he agreed that in the interview, the only discussion as to the supplier was not about any threat—it was that the supplier had shown him a picture of the supplier's daughter and said she was sad that she could not have a birthday party because the supplier could not pay for it without Lopez's money.

Sometime between Lopez's two interviews with police, the supplier told Lopez to kill Lurz. Lopez testified that he declined, and neither he nor Lurz was harmed. Although his debt

6

to the supplier remained unpaid, Lopez was not harmed during the eight-month period between the murder and his arrest. Lopez confirmed at trial that Lurz was still alive. And he acknowledged that after his release on bail, he had been out for about two and a half years. After the evidence closed and deliberations ended, the jury found Lopez guilty of murder as charged in the indictment and assessed a twenty-eight-year sentence of imprisonment.[6] This appeal followed.

## DISCUSSION

**Sufficiency of evidence supporting jury's rejection of defense of duress**

Lopez contends that the evidence is legally and factually insufficient to support his conviction as a party[7] to murder because he proved the affirmative defense of duress. Affirmative defenses may be evaluated for legal and factual sufficiency, even after the Court of Criminal Appeals' opinion in *Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010), abolishing factual-sufficiency review as it applies to criminal convictions. *Butcher v. State*, 454 S.W.3d 13, 20 (Tex. Crim. App. 2015). In a legal-sufficiency review, "reviewing courts should first assay the record for a scintilla of evidence favorable to the factfinder's finding and disregard all evidence to the contrary unless a reasonable factfinder could not." *Petetan v. State*, 622 S.W.3d 321, 337 (Tex. Crim. App. 2021). In a factual-sufficiency review, "the appellate court views the entirety of the evidence in a neutral light, rather than the light most favorable to the verdict," but "may not usurp

---

[6] E pleaded guilty to murder. He did not testify.

[7] Under the law of parties, "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both," and each party to an offense may be charged with its commission. Tex. Penal Code § 7.01(a), (b). A person is criminally responsible for an offense committed by the conduct of another if "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* § 7.02(a)(2). The jury received these statutory instructions on the law of parties in the charge.

7

the function of the jury by substituting its judgment in place of the jury's assessment of the weight and credibility of the witnesses' testimony." *Id.* at 357. The jury's rejection of a defendant's affirmative defense should be overturned for legal insufficiency only if the defendant establishes that the evidence "conclusively proves his affirmative defense" and no reasonable jury was free to think otherwise. *Butcher*, 454 S.W.3d at 20. In a factual-sufficiency review, the jury's finding rejecting a defendant's affirmative defense cannot be overruled unless the verdict is so against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased. *Id.*

A person commits the offense of murder, as charged in this case, by intentionally or knowingly causing the death of an individual. Tex. Penal Code § 19.02. Duress is an affirmative defense to prosecution when it is shown that the actor engaged in the proscribed conduct because he was compelled to do so by threat of imminent death or serious bodily injury to himself or another. *Id.* § 8.05(a). Compulsion, for purposes of the defense of duress, exists only if the force or threat of force would render a person of reasonable firmness incapable of resisting the pressure. *Id.* § 8.05(c). The defense of duress is unavailable if the actor intentionally, knowingly, or recklessly placed himself in a situation in which it was probable that he would be subjected to compulsion. *Id.* § 8.05(d). The jury charge included all these statutory provisions.

"[T]o meet the requirements of duress, the threat of death or serious bodily injury must be *imminent*." *Ramirez v. State*, 336 S.W.3d 846, 851 (Tex. App.—Amarillo 2011, pet. ref'd). An imminent threat has two components of immediacy: (1) the person making the threat must intend and be prepared to carry out the threat immediately, and (2) carrying out the threat must be predicated upon the threatened person's failure to commit the charged offense immediately. *Kelso v. State*, 562 S.W.3d 120, 132 (Tex. App.—Texarkana 2018, pet. ref'd); *Ramirez*, 336 S.W.3d at

8

851. A threat of harm at some indefinite time in the future is insufficient to show that such threat was imminent. *Kelso*, 562 S.W.3d at 132; *Ramirez*, 336 S.W.3d at 851-52.

Here, Lopez admitted to participating in conversations before Gomez's murder about exactly how and where it would be done, buying bullets for a 9-millimeter gun, picking up Gomez and E, choosing a different location from where the murder "was initially supposed to happen" when "[t]he plan changed," picking the apartment building that looked darkest, leaving E and Gomez where Gomez was shot, driving the getaway car, and facilitating payment for Gomez's murder. Lopez contends that his actions were at the supplier's instruction and compelled by the supplier's threat to kill Lopez's family.

Although Lopez wanted the jury to find that the supplier communicated to him a threat to kill Lopez's family immediately if Lopez did not participate in killing Gomez when he did, the jury was free to reject that inference in making its credibility determinations. *See* Tex. Code Crim. Proc. art. 38.04 ("[t]he jury, in all cases, is the exclusive judge of the facts proved, and of the weight to be given to the testimony"); *Matlock v. State*, 392 S.W.3d 662, 671 (Tex. Crim. App. 2013) (prohibiting appellate court from substituting its judgment in place of jury's assessment of weight and credibility of witnesses' testimony). Moreover, as the factfinders, the jury could have credited Lurz's testimony that the murder actually stemmed from Lopez being robbed by Gomez, that Lopez never said he was threatened, and that before the murder she tried to dissuade Lopez. That evidence is consistent with all of Lopez's pretrial statements to police, in which he denied being threatened by somebody and made no mention of any threat from the supplier. Further, because Lopez chose to start dealing methamphetamine as a financial opportunity—despite knowing about cartel violence since middle school and that cartels could kill someone for being short on their money—the jury could have reasonably found that he knowingly or recklessly

9

"placed himself in a situation in which it was probable that he would be subjected to compulsion," and thus, the duress defense was unavailable. *See* Tex. Penal Code § 8.05(d).

In sum, based on the evidence presented, the jury could have rationally concluded that Lopez was not faced with an imminent threat of death or serious bodily injury to his family. *See id.* § 8.05(a); *Kelso*, 562 S.W.3d at 132; *Ramirez*, 336 S.W.3d at 851-52. Since some evidence exists to support the jury's implied negative finding on duress, Lopez did not show that the evidence "conclusively proved" his affirmative defense and that no reasonable jury was free to think otherwise. *See Butcher*, 454 S.W.3d at 20. And given the evidence before the jury, we cannot conclude that the verdict is so against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased. *See id.* Thus, the evidence is both legally and factually sufficient to support the jury's implied negative finding on Lopez's affirmative defense of duress. *See id.* We overrule this issue.

**Extraneous-offense evidence**

Next, Lopez challenges the trial court's admission of the extraneous-offense evidence of the gas-station shooting and disputes that he opened the door to such evidence during voir dire. We review a trial court's decision to admit evidence under an abuse-of-discretion standard. *Bluntson v. State*, 728 S.W.3d 87, 108 (Tex. Crim. App. 2025). No abuse of discretion occurs unless the trial court acts arbitrarily or unreasonably or without reference to any guiding rules and principles. *Id.* We must uphold the trial court's ruling unless its determination lies outside the zone of reasonable disagreement. *Id.* And we uphold an evidentiary ruling if it is correct on any theory of law applicable to the case. *Id.*

10

Evidence is relevant if it has any tendency to make the existence of any fact of consequence more or less probable than it would be without the evidence. *Id.* at 109 (citing Tex. R. Evid. 401). Evidence need not prove or disprove a particular fact by itself to be relevant; it is enough if the evidence provides a small nudge toward proving or disproving a fact of consequence. *Id.* But even relevant evidence may be excluded in some circumstances. The Texas Rules of Evidence prohibit using evidence of a "crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character" and make such evidence inadmissible for that purpose. Tex. R. Evid. 404(b). This evidence may be admissible under Texas Rule of Evidence 404(b) for other purposes, including "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.*

Thus, even if Lopez's voir dire did not open the door to the extraneous-offense evidence of the gas-station shooting, that evidence may be independently admissible at trial under Rule 404(b) if it was used for one of the permitted purposes. It is undisputed that Lopez participated in the gas-station shooting. The dispute is about the connection between that shooting and the shooting of Gomez. Lopez argued that his actions were motivated by duress. The State argued that his actions were motivated by his interest in enforcing his drug-dealing territory. Both parties argued that evidence of the gas-station shooting supported their arguments.

The evidence at trial showed that the incidents bore these similarities:

- The intended victim was suspected of stealing from Lopez or from customers who owed Lopez money for the drugs that he supplied.

- The supplier, according to Lopez, suggested involving E.

- Lopez and E planned how to carry out the shooting.

11

- E was the shooter, and Lopez was the driver.

- Lopez stayed in the car while the shooting took place.

- E used a 9-millimeter gun.

- The shootings were eight days apart—June 15 and June 23.

A reasonable juror could infer that these similarities made it more likely that Lopez intended to kill both H-Town and Gomez as part of a plan to enforce his territory and punish theft rather than to defend against a threat of future harm. Lopez argued that evidence of the gas-station shooting showed that the supplier's threat against Lopez and his family was real. Either way, the gas-station-shooting evidence tended to make the existence of facts of consequence more or less probable than it would have been without the evidence because it was relevant to the defense of duress and to prove Lopez's intent, plan, and motive. *See id.* R. 401, 404(b). Thus, the trial court did not abuse its discretion in determining that the extraneous-offense evidence was relevant under any of these theories.

### Rule 403 balancing

Lopez contends that even if evidence of the gas-station shooting is admissible under Rule 404(b) as proof of motive or to rebut a defensive theory, this evidence should have been excluded under Rule 403. Under Rule 403, a trial court may exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence. Tex. R. Evid. 403. Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Hayes v. State*, 85 S.W.3d 809, 815 (Tex. Crim.

App. 2002). Evidence is unfairly prejudicial when it has an undue tendency to suggest an improper basis for reaching a decision. *Reese v. State*, 33 S.W.3d 238, 240 (Tex. Crim. App. 2000).

In determining whether evidence is admissible under Rule 403, we apply the *Montgomery* factors, considering: (1) the strength of the evidence's probative value, (2) the potential for the evidence to impress the jury in some irrational but nevertheless indelible way, (3) the amount of time required at trial to develop the evidence, and (4) the proponent's need for the evidence. *Hart v. State*, 688 S.W.3d 883, 891 (Tex. Crim. App. 2024); *Montgomery v. State*, 810 S.W.2d 372, 389-90 (Tex. Crim. App. 1990). These factors may blend in practice. *Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006).

The first and fourth factors in the Rule 403 balancing test require consideration of the strength of the evidence's probative value and the State's need for that evidence. *Hart*, 688 S.W.3d at 891. The State has a need for the evidence where it would prove some consequential fact unavailable from other sources. *Id.* at 892. The gas-station-shooting evidence showed that Lopez was willing to participate in shooting someone over a drug debt before he claims to have received any pictures of his family members from the supplier, thus weakening his claim of duress. And it showed, as no other evidence could, that Lopez participated in both shootings—eight days apart—in the same way: planning the shooting with E, locating the target person, dropping E off, and driving E in the getaway car. Lopez pointed to some of the similarities during his first interview with police:

> Detective Sexton: Why should we believe your story instead of, say, somebody else saying you got out of the car and you shot him [Gomez] and E was just there?
>
> Lopez: Because as you can see in the other video that you have of the gas station, I was in the car and E got out and did all the shooting.

13

Evidence of the gas-station shooting was probative of Lopez's culpability for Gomez's death, and the State needed this evidence to show a full picture of the events leading to that murder. Thus, both these factors weigh in favor of admission.

The second factor, "the potential for the evidence to impress the factfinder in some irrational, but nevertheless indelible way," concerns whether the evidence is unfairly prejudicial because of its tendency to suggest decision on an improper basis, often an emotional one. *Gigliobianco*, 210 S.W.3d at 641. When the extraneous offense is no more serious than the charged offense, evidence concerning the extraneous offense is unlikely to cause unfair prejudice. *See Taylor v. State*, 920 S.W.2d 319, 323 (Tex. Crim. App. 1996) (noting that first murder, which was no more heinous than second one, was unlikely to create such prejudice in minds of jurors that they would have been unable to limit their consideration of evidence to its proper purpose). And any impermissible inference of character conformity can be minimized through use of a limiting instruction. *Lane v. State*, 933 S.W.2d 504, 520 (Tex. Crim. App. 1996).

Lopez's indicted offense of murder was more severe than the extraneous attempted offense raised at trial. Evidence of the gas-station shooting where no one was injured was no more inflammatory than the shooting that resulted in Gomez's death. Additionally, the trial court gave a limiting instruction before admitting the extraneous-offense evidence and again in the jury charge. The trial court informed the jury that it could not consider "such other transactions or acts" for any purpose unless the jury found and believed beyond a reasonable doubt that Lopez "participated in such transactions or committed such acts." And even then, the jury could consider the same only for the possible purposes of determining motive and for rebutting a defense of duress, and for no other purpose. It is generally presumed that a jury follows the trial court's instructions. *Allison v. State*, 666 S.W.3d 750, 764 (Tex. Crim. App. 2023). Because there is no

14

evidence that the jury did not follow the trial court's extraneous-offense-evidence instructions, we presume that the jury did follow them. *Id.* at 765. Thus, this factor favors admissibility.

The third factor focuses on the amount of time required during trial to develop the evidence, such that its introduction caused undue delay. *Hart*, 688 S.W.3d at 893. Lopez complains that a significant amount of time was spent with an expert witness on the ballistics-comparison testimony. The expert discussed his comparison of five spent cartridge casings collected from the gas-station shooting to four spent cartridge casings collected from the apartment shooting. He observed that all nine casings had corresponding characteristics, consistent with being fired from the same 9-millimeter gun. He confirmed that because the gun magazine is loaded with the most recently added shells on top, what comes out first are the rounds just purchased and loaded and then any rounds left from a prior batch. A reasonable juror could have inferred from this testimony that the same gun was used in the gas station and apartment shootings and that the bullets Lopez bought on the day of the apartment shooting killed Gomez. Although some time was needed to develop the evidence, including the expert's testimony about comparison of tool marks on shell casings, the presentation was less than 50 pages of a guilt-innocence trial record that exceeded 800 pages. Because the time spent developing this evidence was not disproportionate, this factor also weighs in favor of admission.

When reviewing a trial court's determination under Rule 403, we are to reverse the trial court's judgment "rarely and only after a clear abuse of discretion." *Perkins v. State*, 664 S.W.3d 209, 217 (Tex. Crim. App. 2022) (quoting *Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999)). Only when there exists a clear disparity between the degree of prejudice of the evidence offered and its probative value does Rule 403 apply to exclude evidence. *Bluntson*, 728 S.W.3d at 110. After considering all the above factors, we conclude that no such clear disparity

15

exists here and that the trial court did not abuse its discretion in admitting the extraneous-offense evidence. We overrule this issue.

**Evidence of Facebook and TextNow messages**

In his last issue, Lopez contends that the trial court abused its discretion by admitting Exhibits 165 and 172, evidence of the Facebook and TextNow messages that he exchanged with his non-testifying co-defendant, E, because the messages are inadmissible hearsay and violate Lopez's constitutional right to confrontation. Lopez notes that the State's closing argument during guilt-innocence emphasized the importance of this evidence: "We also saw probably the most reliable information you got in this case, and that's the message exchange between Evan Zanders and Mr. Lopez." We review a trial court's decision to admit evidence under an abuse-of-discretion standard, as set forth in our discussion of the previous issue. *Id.* at 108.

*Hearsay*

Hearsay is a statement, other than one made by the declarant while testifying at trial, that is offered to prove the truth of the matter asserted. Tex. R. Evid. 801(d). An out-of-court statement that is not offered for the truth of the matter asserted, but for some other reason, is not hearsay. *Guidry v. State*, 9 S.W.3d 133, 152 (Tex. Crim. App. 1999). An extrajudicial statement offered for the purpose of showing what was said, rather than for the truth of the matter stated therein, is not hearsay. *Dinkins v. State*, 894 S.W.2d 330, 347 (Tex. Crim. App. 1995). A ruling on the admissibility of an out-of-court statement over a hearsay objection is a matter within the trial judge's discretion, and a reviewing court should not reverse that ruling absent an abuse of that discretion. *Irsan v. State*, 708 S.W.3d 584, 619 (Tex. Crim. App. 2025).

16

The jury was presented with messages that E and Lopez exchanged on TextNow about a week after the murder, and those they exchanged on Facebook about a month after the murder. Sergeant Sexton read excerpts of the messages to the jury.[8] In them, E asks about getting paid, mentions his financial concerns, complains about waiting for his money when the job has been done, and asks about getting phones. Lopez replies that he is getting the "bread tomorrow," confirms that E still has the "9" gun, and says payment is delayed because he is "broke":

[E:] Did you get the text?

[Lopez:] Yeah I just forgot my login to my cash app. I'm unlocking it now

. . . .

[E:] When you think you're going to be able to get the phones

[Lopez:] I'm giving you your bread[9] tomorrow bro
. . . .

[Lopez:] The 9 still there

[E:] I got it

[Lopez:] Bet[10]

. . . .

[E:] Say bro you'll never find a brother more loyal than me that job is done i have shit i need to do I shouldn't have to wait for my money when the job is finished already I have to many games going on around me and I'm about to go the fuck off bro if you're keeping me on your team don't try get me the rest of my money today bro my daughter messaging don't have money to get back and forth to work i need a phone take care of the people who take care of you

---

[8] Capitalization, spelling, and punctuation are from the original messages.

[9] Based on his training and experience, Sergeant Sexton testified that "bread" means "money."

[10] Based on his training and experience, Sergeant Sexton testified that "bet" means "okay."

17

. . . .

[E:] What's the bubble i need to get something going bro my daughter needs 287.67 to keep her lights on bro you still had not had a chance to take care of me for the thing i got for u and i don't know who yall do things but if i was sitting on top NOBODY that's my family would be with out and I'm not saying you are the one on top but I'm giving you the message to send it to the ine on top i can go with out lights but my daughter has to kids and i can't expect that for her and the kids so just let me know what's going on on so i can know whether to take things in my own hands or not I'm straight up and i never renege on family so just It me know bro so i can di what i need to do I'm not the guy everyone thinks i am im more powerful and a true ruler

Remember I'm Noble and loyal and I've already been played i just over looked it but to be totally honest I'm the one God calls on when everyone has fucked make sure that's understood and I've been lied to and i know more than what i care to talk about and I'm a inch away from be provoked to anger plus I'm the best of the best i was just holding back and to prove it I'm about to start entering dreams

[Lopez:] Bro I have so much going on right now. But for me you to come at me like that when I've only been 100 with you. Beyou always do this you always alike I need this I need that I need this I'm 100 with you I'm 100 with you. What about all the times you were short bro you have never paid any debt that you owed ever. I help you when I can bro I'm broke what you want me to do pull it out of my ass

We need not address whether the trial court erred in the admission of these messages because the same or similar evidence was admitted at another point in the trial without objection, and our harm analysis is dispositive. *See Wooten v. State*, 400 S.W.3d 601, 607 (Tex. Crim. App. 2013); *Cook v. State*, 665 S.W.3d 595, 600 (Tex. Crim. App. 2023); *see also* Tex. R. App. P. 44.2(b) (stating that non-constitutional error that does not affect substantial rights must be disregarded). The Facebook and TextNow messages between Lopez and E showed their relationship and arrangement: E completed a job, Lopez agreed to pay him to do that job, and E was angry that Lopez had not paid as promised. Evidence of this relationship and of their arrangement was also provided to the jury through testimony that was more directly inculpatory. Lopez himself testified that he participated in conversations about how and where Gomez's killing would be done, that he

18

bought the bullets, and that he facilitated payment to E for Gomez's killing. Sergeant Sexton testified without objection that E pleaded guilty to Gomez's murder, so E's role in Gomez's death was established by other evidence. Lopez testified that this job was in E's "wheelhouse" and that E threatened him when E did not get his money. Erroneous admission of evidence will not result in reversal when other such evidence was received without objection, before or after the complained-of ruling. *Cook*, 665 S.W.3d at 600. Although the messages showed Lopez's arrangement with E, other evidence admitted at trial showed their arrangement in greater detail and identified their respective roles in Gomez's killing. Thus, any non-constitutional error in admitting the messages is harmless and does not entitle Lopez to reversal. *See id.*

### *Right of confrontation*

The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The Confrontation Clause bars admission of testimonial statements from a witness who does not appear at trial unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness. *Bullcoming v. New Mexico*, 564 U.S. 647, 658 (2011); *Crawford v. Washington*, 541 U.S. 36, 59 (2004); *Allison*, 666 S.W.3d at 762. This procedural bar is limited to testimonial statements because only testimonial statements cause the "declarant" to be a "witness" within the meaning of the Confrontation Clause. *Davis v. Washington*, 547 U.S. 813, 821 (2006) (citing *Crawford*, 541 U.S. at 51).

The Confrontation Clause does not bar admission of nontestimonial hearsay. *Michigan v. Bryant*, 562 U.S. 344, 354 (2011); *Sanchez v. State*, 354 S.W.3d 476, 485 (Tex. Crim.

19

App. 2011). Thus, the first step in a Confrontation Clause analysis is determining whether the statement at issue was testimonial. *Allison*, 666 S.W.3d at 762. An accuser who makes a formal statement to a government official bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. *Id.* (citing *Crawford*, 541 U.S. at 51). Although the exact contours of what is considered testimonial continue to be defined by courts, such statements are formal and similar to trial testimony. *Id.* Examples of testimonial statements include affidavits, custodial examinations, depositions, prior testimony, confessions, similar pretrial statements that declarants would reasonably expect to be used in a prosecution, and statements made under circumstances that would lead an objective witness to reasonably believe that the statement would be available for use at a later trial. *Id.* Whether a statement is testimonial is a question of law reviewed de novo. *Langham v. State*, 305 S.W.3d 568, 576 (Tex. Crim. App. 2010).

Here, the complained-of messages between Lopez and E on Facebook and TextNow were neither formal statements to a government official nor akin to trial testimony—they were casual remarks between co-conspirators. The subject of the messages, the method of their transmission, and the circumstances under which their communication occurred weigh against concluding that their statements are testimonial in nature. Nothing in the record supports the conclusion that either man reasonably expected his messages would be used in a criminal prosecution. Nor were their statements made under circumstances that would lead an objective witness to reasonably believe that the statements would be available for use at a later trial. Because these statements were nontestimonial, there was no need to show the unavailability of the declarant, E, nor that Lopez had a prior opportunity to cross-examine him. We conclude that the trial court did not violate Lopez's right of confrontation by admitting the Facebook and TextNow messages into evidence. We overrule Lopez's last issue.

20

## CONCLUSION

We affirm the trial court's judgment of conviction.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Kelly and Ellis
  Concurring Opinion by Justice Kelly

Affirmed

Filed:   June 30, 2026

Do Not Publish